UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                                               CASE NO. 3:22-cr-79-LAB-JBT

JESSE RANCE MOORE
_____/

**REPORT AND RECOMMENDATION**

**THIS CAUSE** is before the Court on Defendant's Motion to Suppress Evidence ("Motion") (Doc. 55) and the Government's Response thereto ("Response") (Doc. 57). The undersigned held an evidentiary hearing on August 3, 2023. (Docs. 65 & 66.)[1] For the reasons stated herein, the undersigned respectfully **RECOMMENDS** that the Motion be **DENIED**.

**I.   Summary of Recommendation**

Defendant makes two arguments in support of the Motion. The undersigned recommends that neither has merit. First, Defendant argues that he was unlawfully detained without reasonable suspicion by Detective Nigel Elliott with the Columbia County Sheriff's Office ("CCSO").[2] (Doc. 55 at 2–3, 4–5.) The undersigned recommends that the evidence does not support this argument. The Government proved by a preponderance of the evidence that the encounter between Detective

---

[1] The transcript of the hearing is found at Doc. 66 and will be cited as "Tr." followed by the page number(s).

[2] Elliott is now a deputy, rather than a detective, with CCSO. (Tr. 6.) However, he will be referred to herein as a detective since he was so employed on the date in question.

Elliott and Defendant was consensual.  Therefore, the encounter did not implicate the Fourth Amendment.  *See, e.g., United States v. Perez*, 443 F.3d 772, 777–78 (11th Cir. 2006).

In view of all of the pertinent circumstances, a reasonable person in Defendant's position would have believed he was free to leave.  Defendant's vehicle was already parked on the side of the road when Detective Elliott stopped.  Detective Elliott did not activate his siren, he parked catty-corner behind Defendant's vehicle such that Defendant and his wife could have left, and Defendant was not in sight when Detective Elliott stopped.  Although Detective Elliott did activate his lights when he stopped, he did so because his car was unmarked, and he was signifying that he was with law enforcement.  Most importantly, Defendant was the one who initiated contact with Detective Elliott as Detective Elliott was in the process of leaving.  Also, Detective Elliott never asked Defendant or his wife for any identification nor did he check them for weapons or issue them any commands.

Second, Defendant argues that the later search of his property was a Fourth Amendment violation because CCSO officers trespassed without permission and/or a search warrant.  The undersigned recommends that this argument be rejected as well because the subject property falls squarely within the open fields doctrine.  *Oliver v. United States*, 466 U.S. 170, 180–83, (1984).  The subject

property, which is a semi-wooded, undeveloped lot, did not contain any home or other structure, and therefore could not be considered curtilage. Therefore, trespass has no relevance in this case. Thus, the undersigned recommends that the Motion be denied.

## II.     Summary of Evidence

At the evidentiary hearing, the Government called one witness, Detective Nigel Elliott. The Government also admitted four exhibits into evidence: Government's Exhibit 1 (roadside view of Defendant's wooded lot) (Doc. 65-3); Government's Exhibit 2 (side view of Defendant's wooded lot) (Doc. 65-4); Government's Exhibit 3 (front view of Defendant's wooded lot) (Doc. 65-5); and Government's Exhibit 4 (full front view of Defendant's wooded lot) (Doc. 65-6).

Defendant called two witnesses, both employed by CCSO: Detective Chad Guerry and Lieutenant Don Meyer. Defendant also admitted four exhibits into evidence: Defendant's composite Exhibit 3 (photos of Hertz rental car) (Doc. 65-7); Defendant's Exhibit 4 (photo of car at pharmacy from 1/13/2022) (Doc. 65-8); Defendant's Exhibit 7 (Suwanee County Property Appraiser report for Defendant's property) (Doc. 65-9); and Defendant's Exhibit 10 (DAVID report for Defendant's vehicle trailer) (Doc. 65-10).

Generally, the undersigned found all of the witnesses credible, particularly Detective Elliott. He was the only one with direct knowledge of the pertinent facts

and circumstances.  Defendant's attempts to impeach his credibility through cross-examination or otherwise were not effective.

### A. Detective Elliott

Detective Elliott first testified that he is now a deputy sheriff with CCSO (formerly a detective) and he has worked for CCSO for five years.  (Tr. 6.)  He has extensive law enforcement training.  (*Id.*)

On January 13, 2022, Detective Elliott was driving from his office in Lake City, Florida, toward Fort White, Florida, in an unmarked police vehicle.  (Tr. 7, 9.)  He was BOLOing (traveling on the roadway while "being on the lookout") the area following an alert stating that there had been a robbery at the North Florida Pharmacy in Fort White.  (Tr. 7–8.)  The subject was reported as traveling westbound in a silver or blue-gray Hyundai on U.S. Highway 27.  (Tr. 8.)

Detective Elliott decided to take Columbia County Road 240 (216th Street in Suwannee County) as an alternate route "in case the person was trying to travel northbound out of the area."  (Tr. 8–9.)  He drove into Suwannee County and then turned around and came back towards Columbia County.  (Tr. 9.)  As he was approaching Columbia County, he saw a vehicle on the north side of the roadway that matched the BOLO description.  (Tr. 9–10.)  The vehicle was stopped off the road near the entrance to a property containing "two posts and a little cable going

4

across it." (Tr. 10.) The property was partially wooded, undeveloped land containing no houses or other structures. (*Id.*)

As he was driving, Detective Elliott further observed a male and female standing outside of the parked vehicle. (*Id.*) The couple appeared to be in an argument because "the man had his arm extended out [with the palm open] and was, like, shaking it." (Tr. 10, 41.) The man was on the passenger side of the vehicle and the woman was on the driver's side. (Tr. 11.) Although the vehicle appeared to match the BOLO description, Detective Elliott was not concerned that the couple could have been involved in the robbery because he thought the robbery involved only one person. (Tr. 10, 19.)

After driving past the couple, Detective Elliott turned around and went back to "check out with them" due to his concern about the potential for some type of violence. (Tr. 10, 59.) He pulled in catty-corner behind the car, and he activated his lights to make the couple aware that he was a law enforcement officer. (Tr. 9, 11.) He could not recall whether he left his lights on. (Tr. 12.) He did not sound his siren. (*Id.*) There was room for Defendant's car to either back out or pull forward by removing the chain/rope. (Tr. 19, 58.) Detective Elliott exited his vehicle wearing a CCSO polo shirt tucked into khaki pants. (*Id.*) The shirt featured the CCSO badge and his name for identification. (*Id.*) He also had on either side

5

of him his service weapon, badge, phone, handcuffs, and additional ammunition. (*Id.*)  He never drew or otherwise displayed his weapon.

As Detective Elliott exited his vehicle, the female met him halfway between the two vehicles.  (Tr. 11–12.)  At that time, Defendant was not even visibly present in the area.  (Tr. 12–13.)  Detective Elliott later found out that Defendant was "in the field past the little gate and post" picking up flags.  (Tr. 13.)  The female informed Detective Elliott that the property belonged to her and Defendant, and that they were clearing the property and planting trees.  (*Id.*)  Detective Elliott did not mention the robbery, did not question her about it, and did not ask her to get or call Defendant.  (Tr. 13.)

After speaking with the female and getting assurance that everything was okay, Detective Elliott went back to his vehicle and began to leave.  (Tr. 14.)  As Detective Elliott was leaving, Defendant approached him and flagged him down. (*Id.*)  Detective Elliott stopped and rolled down the passenger window of his car to speak with Defendant.  (Tr. 14, 18.)  Defendant also told Detective Elliott that he and the female were planting trees and asked Detective Elliott if he would like to stay to help them.  (Tr. 18.)  Detective Elliott then left.  (Tr. 19.)

During this encounter, Detective Elliott did not inform Defendant or the female that their car fit the description of one used in a robbery, or even bring up the robbery at all.  He did not ask them for any identification and did not get any

identifying information, other than typing the car's tag number into his computer when he stopped, which is routine. (Tr. 13–14, 18, 43–44.) He did not even run the tag until later. (Tr. 44.) He never called for backup or called in his location. (Tr. 33.) He never patted down Defendant or the female and did not ask them if they were armed. As to both, he just "had a little conversation." (Tr. 12, 18.)

### B.   Detective Guerry & Lt. Meyer

Defendant called Detective Guerry, who testified that he responded to a pharmacy robbery in Fort White on January 13, 2022. (Tr. 62–63.) He interviewed the pharmacy staff following the robbery and took down a description of a light blue passenger car that the suspect was driving. (Tr. 66.) He also helped write the CCSO report of the robbery. (Tr. 63–64.)

Defendant also called Lt. Meyer, who oversaw and approved the reports of the robbery. (Tr. 73–74.) He also obtained the Hyundai from Hertz rental. (Tr. 74.) He acknowledged that after the FBI interviewed him, the FBI wrote in its report "Elliott did not have enough reasonable suspicion to further detain the Moores." (Tr. 81.) Neither this statement in the FBI report nor any other point brought out during the testimony of either of these witnesses substantially affected the credibility of Detective Elliott. This apparent attempt at impeaching Detective Elliott through a third-hand statement was not persuasive and was also not probative of

7

whether any detention actually occurred, especially compared to the credible testimony of Detective Elliott.[3]

### III.   Analysis

"[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."  *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).  The undersigned recommends that the Government proved by a preponderance of the evidence that CCSO did not violate Defendant's Fourth Amendment rights.

### A.   Defendant's Encounter With Detective Elliott Was Consensual.

Defendant first argues that Detective Elliott unlawfully detained him without any reasonable suspicion.  (Doc. 55 at 2–4.)  The undersigned recommends that this encounter was consensual.  Therefore, Defendant was never seized within the meaning of the Fourth Amendment.

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave."  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  "There are three broad categories of

---

[3] It is noteworthy that Defendant never impeached Detective Elliott with any significant prior inconsistent statement that Detective Elliott made in his own report or otherwise.

8

police-citizen encounters for purposes of [a] Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *Perez*, 443 F.3d at 777 (citation omitted).

As the Supreme Court has explained:

> Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen. Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means.

*United States v. Drayton*, 536 U.S. 194, 200–01 (2002) (internal citations omitted).

In determining whether a seizure has occurred, courts consider, among other things:

> "whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police."

*Perez*, 443 F.3d at 778 (quoting *United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991)). "A seizure occurs for Fourth Amendment purposes . . . only when, by means of physical force or a show of authority, a person's freedom of movement is restrained." *Perez*, 443 F.3d at 778 (alteration adopted) (internal

quotation marks and citations omitted).

In circumstances presented in prior cases, the Eleventh Circuit has determined that a reasonable person would have felt free to terminate an encounter with the police when he was physically capable of walking or driving away. *See, e.g., United States v. Knights*, 989 F.3d 1281, 1286–88 (11th Cir. 2021) (no seizure was found where the defendant was capable of driving or walking away, the officers did not display weapons, and the officers did not issue any commands). The Eleventh Circuit has also "decided on several occasions that a police officer does not seize an individual merely by approaching a person in a parked car." *Miller v. Harget*, 458 F.3d 1251, 1257 (11th Cir. 2006) (holding that the defendant was not initially detained or seized within the meaning of the Fourth Amendment where the officer simply parked behind the defendant's vehicle, turned on his "window lights," and approached the defendant's vehicle).

The undersigned recommends that, as the Eleventh Circuit did in *Perez*, this Court should "readily conclude the circumstances indicate only a consensual encounter." *Perez*, 443 F.3d at 778. Most obviously, Defendant actually approached Detective Elliott and flagged him down as Detective Elliott was leaving. (Tr. 14.) All of the other pertinent circumstances also weigh heavily in favor of a consensual encounter. Defendant's path was not blocked or impeded. Defendant's car was not blocked. Detective Elliott never questioned Defendant or

his wife about the robbery, never patted them down or asked them about weapons, never asked for identification, never touched anyone, never displayed his weapon, and never issued any commands.

As in *Perez*, Detective Elliott activated "his blue lights, but only to identify himself as a police officer because he arrived at the scene in an unmarked car." *Perez,* 443 F.3d at 778. Even assuming Detective Elliott left his lights on during the entire brief encounter, a reasonable person in the same circumstances as Defendant would not have felt compelled to approach him. Moreover, courts "accord 'little weight' to the unremarkable fact that [a police officer] was in uniform and had a holstered firearm." *Id.* at 778 n.2. In the case at bar, Detective Elliott was not even in a traditional uniform. In short, it is abundantly clear that a reasonable person in Defendant's position would have felt free to terminate the encounter with (or not approach in the first place) Detective Elliott.

Finally, Detective Elliott did not need any reason to stop and approach Defendant's vehicle. The undersigned accepts Detective Elliott's testimony that he stopped because Defendant and the female were arguing on the side of the road. But even if the robbery was a factor in Detective Elliott's mind, it did not matter. It was still a consensual encounter. In fact, Detective Elliott could have done much more than he actually did without triggering a seizure, such as "pose questions, ask for identification, and request consent to search" so long as

11

coercive means were not used. *Id.* at 777. Detective Elliott did none of those things. The undersigned recommends that a seizure did not occur.

### B. CCSO's Search of Defendant's Property Did Not Violate the Fourth Amendment.

Defendant next argues that, after his encounter with Detective Elliott, CCSO came back and "trespassed on [his] physical property" in violation of the Fourth Amendment. (Doc. 55 at 4.) As shown in the photographs admitted into evidence, the property had "no trespassing" signs and a chain or rope between two posts displaying the signs. (Tr. 17; Doc. 65-5.) However, in *Oliver* the Supreme Court explicitly and firmly rejected "the suggestion that steps taken to protect privacy establish that expectations of privacy in an open field are legitimate." *Oliver,* 466 U.S. at 182.

As the Eleventh Circuit has stated, Fourth Amendment protection is afforded not only to a person's home, but to "[t]he private property immediately adjacent to a home," i.e., the "curtilage." *United States v. Taylor*, 458 F.3d 1201, 1206 (11th Cir, 2006) (citing *Oliver*, 466 U.S. at 180). "At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' and therefore has been considered part of the home itself for Fourth Amendment purposes.'" *Taylor*, 458 F.3d at 1206 (quoting *Oliver*, 466 U.S. at 180) (alteration adopted). Thus, the essential question is whether a defendant should reasonably expect the property for which he is claiming Fourth

12

Amendment protection to be treated "as the home itself." *Taylor*, 458 F.3d at 1206.

Further, as the Supreme Court stated in *Oliver*, "an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers. . . . Nor is the government's intrusion upon an open field a 'search' in the constitutional sense because that intrusion is a trespass at common law." 466 U.S. at 181, 183. "Thus, in the case of open fields, the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment." *Id.* at 183. "[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Id.* at 178.

Defendant's property at issue fits squarely within the open fields doctrine as set forth in *Oliver*. The property does not contain Defendant's home or dwelling, or any structures at all. It is just a semi-wooded lot, easily accessible to anyone who does not see, or is willing to walk around, two posts with "no trespassing" signs. (Tr. 10; *see also* Docs. 65-3, 65-4, 65-5, & 65-6.) Binding case law makes clear that the minimal steps Defendant took to protect privacy, as well as any trespass by CCSO, are irrelevant to the Fourth Amendment analysis. Therefore, the undersigned recommends that there was no Fourth Amendment violation.

13

## IV. Conclusion

For all of the foregoing reasons, it is respectfully **RECOMMENDED** that:

The Motion (**Doc. 55**) be **DENIED**.

### Notice to Parties

"Within 14 days after being served with a copy of the recommended disposition [of a motion], . . . a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2). "Failure to object in accordance with this rule waives a party's right to review." *Id.*; *see also* 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1.

**DONE AND ENTERED** in Jacksonville, Florida, on August 28, 2023.

*/s/ Joel B. Toomey*
JOEL B. TOOMEY
United States Magistrate Judge

Copies to:

The Honorable Larry A. Burns
Senior United States District Judge

Counsel of Record

14